**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION  NO. 3:07-CV-184**

**REBECCA TEEL**                                                                                              **PLAINTIFF**

**V.**

**SEDGWICK CLAIM MANAGEMENT**
**SERVICES, INC., and PNC FINANCIAL**
**SERVICES GROUP AND AFFILIATES**
**LONG TERM DISABILITY PLAN**                                                              **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on motions for judgment on the administrative record by both Plaintiff Rebecca Teel and the Defendants. [DN 19,21].  Fully briefed, this matter is ripe for decision.  For the following reasons, the Defendants' motion for judgment on the record is **GRANTED** and the Plaintiff's motion for judgment on the record is **DENIED**.[1]

**I. FACTS**

Plaintiff Rebecca Teel worked for the Defendant, PNC Financial Services Group ("PNC"), as a Sales and Services Specialist for almost four years. As a full-time employee of PNC, the Plaintiff participated in PNC's Long-Term Disability Plan ("the Plan").  The Plan is a fully self-funded, employee welfare benefit plan that provides salaried employees with up to 70% of their base salary when they are out of work for periods of longer than 90 days. The Plan designates PNC as the Plan Administrator but vests PNC with the authority and discretion to employ individuals or firms to assist in the administration of the Plan. Pursuant to this provision, PNC entered into an

---

[1] As part of their motion for judgment on the administrative record, the Defendants argue that under ERISA 502(a)(1)(b) the Plaintiff may assert a claim only against the Plan itself and not any other entity, such as Sedgwick. However, because the Court finds that Sedgwick's decision to deny the Plaintiff long-term disability benefits was not arbitrary and capricious, the Court need not address this argument.

administrative services agreement with Defendant Sedgwick Claim Management Services, Inc. ("Sedgwick"). This agreement confers upon Sedgwick the authority to evaluate and decide claims and to review and resolve any appeal of a denied claim.

Under the Plan, a participant is entitled to disability benefits for up to 24 months upon proof that he or she "cannot perform each of the material duties of *his or her regular occupation*" because of injury or sickness during that time. (DN 19, Attach. 4, The Plan, p. 5)(emphasis added). After benefits have been paid for 24 months, however, the participant will continue to receive benefits only upon proof that he or she "cannot perform each of the material duties of *any gainful occupation* for which he or she is reasonably fitted by training, education, or experience." (Id.)(emphasis added). The Plan also states that a participant 1) may not receive total disability benefits for mental illness for more than 24 months unless the participant is in a hospital or institution as a result of mental illness at the end of the 24-month period (Id., p. 13, ¶ 14); and 2) may not receive partial disability benefits as result of mental illness (Id., p. 14, ¶ 14(e)).

On August 10, 2004, the Plaintiff applied for long-term benefits under the Plan. In her application for benefits, she stated that she had stopped working on June 7, 2004 because was "suicidal" and experiencing "anxiety" and "chronic crying." Sedgwick found that her alleged mental illness prevented her from performing the duties of her "regular occupation" and approved her application for long-term disability benefits for the 24-month period. In March 2006, as the end of 24-month period approached, Sedgwick began to evaluate the Plaintiff's continued eligibility for long-term benefits under the "any gainful occupation" standard of the Plan. As part of this process, Sedgwick asked the Plaintiff and her doctors to submit updated medical information regarding her *physical* ability to work since, under the terms of the Plan, she could not receive disability benefits for mental illness for more than 24 months.

The Plaintiff, her psychiatrist (Dr. Humphrey), her rheumatologist (Dr. June), her spinal surgeon (Dr. Mahan), and her pulmonary care specialist (Dr. Anderson) all submitted information for Sedgwick to review. The psychiatrist, Dr. Humphrey, stated that he had released the Plaintiff to part-time low-stress work on December 21, 2005 at which time the Plaintiff began working as a receptionist at a local college for 20 hours a week. When asked whether he believed that Plaintiff could increase her hours to work full-time, he stated that he did not believe that she could work more hours or at a more demanding job due to her fragile mental state.

The Plaintiff's rheumatologist, Dr. June, noted that the Plaintiff had been diagnosed with psoriatic arthritis, right lateral epicondylitis, osteoarthritis, and degenerative disc disease. When asked if the Plaintiff would be unable to work or had any work limitations based on any of these diagnoses, Dr. June stated that the Plaintiff could not work in a position that required prolonged ambulation, standing greater than 10 minutes, or kneeling or crouching.

The records of the spinal surgeon, Dr. Mahan, show that he had diagnosed the Plaintiff with low back pain which he thought was related to arthritis and which he did not believe would require surgical intervention.

The Plaintiff's pulmonary care specialist, Dr. Anderson, noted that the Plaintiff had dyspnea, abnormal pulmonary function, and obstructive sleep apnea syndrome. He initially stated that he did not believe that the Plaintiff was capable of performing sedentary work based upon these diagnoses, but then he contradictorily opined: "To what degree she may perform her sedentary work adequately; I think depends on her other diagnoses for which I do not treat her..."

Because Dr. Anderson provided contradictory opinions regarding the Plaintiff's ability to work, Sedgwick retained a rheumatologist and pulmonologist to review the Plaintiff's medical

information. The rheumatologist concluded that the Plaintiff had the physical ability to perform light to medium work duties by DOT standards. The pulmonologist concluded that, despite her physical diagnoses, the Plaintiff was perfectly capable of performing sedentary work.

Based upon these medical opinions and the Plaintiff's training, education, and experience, Sedgwick found that the Plaintiff was capable of performing the material duties of a "gainful occupation," such as an administrative assistant, credit authorizer, claims clerk, credit clerk, or as an insurance rater. Sedgwick thus concluded that the Plaintiff was not entitled to receive benefits under the Plan beyond the initial 24-month period.

The Plaintiff appealed this decision. Thereafter, Sedgwick referred Plaintiff's file to five independent board certified physicians for review, including a pulmonologist, neurologist, psychiatrist, orthopedic surgeon, and a rheumatologist. The neurologist concluded that there was "no evidence of a sleep disorder to disable [the Plaintiff] from any work at any occupation." The pulmonologist concluded that the Plaintiff's diagnoses of mild restrictive pulmonary function and obstructive sleep apnea do not render her "unable to work for any occupation for which she may be qualified." The psychiatrist concluded that the Plaintiff was not disabled from performing any occupation due to her mental state. The orthopedic surgeon concluded that "there is no validation that the employee cannot engage in full time sedentary-light category work activities from the orthopedic perspective." And, finally, the rheumatologist concluded that from "a rheumatology perspective, [the Plaintiff] is not currently disabled from a rheumatological diagnosis of osteoarthritis or psoriatic arthritis..." Based upon the opinions of these physicians and the lack of any contradictory opinions by the Plaintiff's doctors, Sedgwick upheld its initial decision to deny the Plaintiff further benefits. It is this decision that the Plaintiff now asks the Court to reverse.

## II. STANDARD OF REVIEW

A denial of benefits challenged under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, et seq., is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan. Williams v. International Paper, 227 F.3d 706, 710 (6th Cir. 2000). Where an ERISA plan expressly affords discretion to trustees to make benefit determinations, a reviewing court should apply the arbitrary and capricious standard to the administrator's actions. Id. at 711. Because the Plan here clearly grants the Plan Administrator the "power, authority, and discretion necessary" to interpret the Plan; determine the eligibility of employees; determine questions of fact and law; calculate the amount of benefits payable to any claimant, the Court holds that, despite the Plaintiff's arguments to the contrary, the arbitrary and capricious standard of review is appropriate. (DN 10, Attach. 4, The Plan, p. 15-16, ¶ 3).

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. Id. at 712; Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1993). When applying the arbitrary and capricious standard, a court must decide whether the plan administrator's decision was "rational in light of the plan's provisions." Williams, 227 F.3d at 712 (quoting Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1998)). Accordingly, where it is "possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Williams, 227 F.3d at 712 (quoting Davis, 887 F.2d at 693)

Despite this deferential standard, however, the court's review is no mere formality. The arbitrary and capricious standard does not require the court merely to rubber stamp the administrator's decision. Instead, the court is required to review the quality and quantity of the

medical evidence and the opinions on both sides of the issues. <u>Glenn v. MetLife</u>. 461 F.3d 660, 666 (6th Cir. 2006).

## III. ANALYSIS

The Plaintiff argues that Sedgwick's decision to deny her long-term disability benefits under the PNC Long-Term Disability was arbitrary and capricious. Specifically, the Plaintiff argues that Sedgwick's decision was unreasonable because the physicians retained by Sedgwick ignored the opinions of the Plaintiff's treating physicians; did not physically examine the Plaintiff; and did not consider the possibility that the combined effects of the Plaintiff's diagnoses rendered her disabled. The Plaintiff also argues that the unreasonableness of Sedgwick's decision is evidenced by the fact that the Social Security Administration found the Plaintiff to be disabled. Finally, the Plaintiff urges the Court to consider the effect of two apparent conflicts of interest upon Sedgwick's decision - the conflict that exists because PNC is the decision-maker and payor of claims under the Plan and the conflict that exists because the doctors retained by the Defendants were paid by the Defendants. The Defendants argue, however, that they are entitled to judgment because their decision to deny the Plaintiff long-term benefits was rational in light of the Plaintiff's failure to meet her burden of establishing that she was totally disabled within the meaning of the Plan. The Court will address each of these arguments in turn.

**A. The Medical Evidence**

As noted above, to receive total disability benefits under the Plan after benefits have been paid for 24 months, a Plan participant must prove that "the Participant cannot perform each of the material duties of any gainful occupation for which he or she is reasonably fitted by training, education or experience." (DN 19, Attach. 4, The Plan, p.4-5). The Plaintiff argues that she has

submitted ample evidence to prove that she is totally disabled within the meaning of the Plan, including medical records documenting her diagnoses of psoriatic arthritis, right lateral epicondylitis, osteoarthritis, degenerative disc disease dyspnea, abnormal pulmonary function, and obstructive sleep apnea syndrome. She also points to her psychiatrist's statement that she could not work full-time or in a demanding position due to her "fragile" mental status. (Administrative Record ("AR"), p. 267).

The Defendants, on the other hand, argue that the Plaintiff has not proven that she is totally disabled under the terms of the Plan. While they do not dispute her medical diagnoses, they note that although they sent each of the Plaintiff's treating physicians a questionnaire asking them whether they believed that the Plaintiff was unable to work, not one of the physicians who was treating the Plaintiff for physical ailments unequivocally so opined. Indeed, Dr. June, the Plaintiff's rheumatologist, responded to the questionnaire by noting that the Plaintiff was limited by her psoriatic arthritis and could not work in position that required prolonged ambulation, standing greater than 10 minutes, or kneeling or crouching. (AR , p. 230). And, Dr. Anderson, the Plaintiff's pulmonary specialist, responded that while he did not believe that the Plaintiff was capable of performing sedentary work, "[t]o what degree she may perform her sedentary work adequately; I think depends on her other diagnoses for which I do not treat her..." (AR, p. 205).

The Defendants also contend that the extent to which the Plaintiff's psychiatrist opines that she is disabled due to mental illness is irrelevant since, under the terms of the Plan, a participant 1) may not receive total disability benefits for mental illness for more than 24 months unless the participant is in a hospital or institution as a result of mental illness at the end of the 24-month period (Id., p. 13, ¶ 14); and 2) may not receive partial disability benefits as result of mental illness

7

(DN 19, Attach. 4, The Plan, p. 13 -14, ¶14-14(e)).

Finally, the Defendants point to the conclusion reached by the seven doctors retained by Sedgwick to review the Plaintiff's medical file. All seven doctors concluded, based on their respective specialties, that there was no objective data in the Plaintiff's medical record evidencing an inability to perform sedentary job duties. And while the Plaintiff argues that the opinions of these doctors should be discounted since they did not physically examine the Plaintiff, the Sixth Circuit has held that "reliance on a file review does not, standing alone, require the conclusion that [the insurer] acted improperly." Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005). Here, the evidence suggests that these physicians thoroughly reviewed the Plaintiff's medical records and personally discussed the Plaintiff's conditions with her treating physicians.[2] And, although the Plaintiff argues that these physicians failed to explain why their medical opinions differed from those of the Plaintiff's treating physicians, the Court disagrees. These physicians seemed to accept the diagnoses of the Plaintiff's treating physicians, and although they concluded that, despite these diagnoses, the Plaintiff was able to work full-time, the only treating physician who clearly disputed this sentiment was Dr. Humphrey, the Plaintiff's psychiatrist.

Based on the above, the Court concludes that Sedgwick's finding that the Plaintiff was not "totally disabled" under the terms of the Plan was not arbitrary and capricious. Although the Plaintiff submitted substantial evidence of her diagnoses, the lack of evidence submitted regarding the effect of these diagnoses upon the Plaintiff's physical ability to work, in addition to the medical opinions of the seven physicians hired by Sedgwick, make Sedgwick's conclusion that Plaintiff was

---

[2]The Court is confused by the Plaintiff's frequent references to Gismondi v. United Technologies Corp., 408 F.3d 295 (6th Cir. 2005), for the proposition that the retained physicians reviews of the Plaintiff's records were inadequate. The Sixth Circuit did not discuss the adequacy of medical evaluations in Gismondi.

8

not "totally disabled" under the terms of the Plan reasonable.

## B. The SSA Determination

The Plaintiff also contends that the decision of Sedgwick was arbitrary because Sedgwick failed to consider the award of disability benefits that she secured from the Social Security Administration. And, indeed, in the Sixth Circuit "a disability determination by the Social Security Administration is relevant in an action to determine the arbitrariness of a decision to terminate benefits under an ERISA plan." Glenn v. Metlife, 461 F.3d 660, 667 (6th Cir. 2006).

Here, however, the Court finds that Sedgwick cannot be held responsible for failing to consider in its decision-making process the Social Security Administration's finding that the Plaintiff was "totally disabled." Although the Plaintiff informed Sedgwick by phone that the SSA had awarded benefits to her, no portion of the SSA's decision, nor the findings upon which it was based, were ever submitted to Sedgwick as evidence of the Plaintiff's disability.

## C. Conflicts of Interest

Finally, the Plaintiff urges the Court to consider the effect of two allegedly inherent conflicts of interest upon Sedgwick's decision to deny the Plaintiff disability benefits. First, the Plaintiff asks the Court to consider the conflict that exists since PNC is the alleged decision-maker and payor of claims under the Plan; and, second, the Plaintiff asks the Court to consider the conflict that exists since the doctors retained by the Defendants were paid by the Defendants.

As to the first argument, the evidence establishes the Plan is "self-funded by means of a separate trust established by PNC solely for the purpose of providing benefits" and that "PNC makes fixed, periodic cash contribution to the [trust] based on calculations and projections of its future long term disability liability performed by an independent actuary." (DN 19, Attach. 5, Gehlke

9

Declaration, ¶ 5-6). Further, "PNC holds no residual interest in the assets of the [trust]. Rather any and all monies in the trust are contributed without condition at all times and at all times must be used for the exclusive benefit of Plan participants or beneficiaries." (Id., ¶ 6). And, although PNC is the designated administrator and named fiduciary of the Plan, PNC entered into an administrative services agreement with Sedgwick which conferred upon Sedgwick the authority to evaluate and decide claims and to review and resolve any appeal of a denied claim.

In Firestone Tire & Rubber Co. v. Bruch, the Supreme Court held that where a "benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighted as a factor in determining whether there is an abuse of discretion." 489 U.S. 101, 115 (1989). Accordingly, the Sixth Circuit has held that district courts must consider the effect of the apparent conflict of interest that exists where one party is authorized to decide whether an employee is eligible for benefits and to pay those benefits. See, e.g., Glenn, 461 F.3d. at 666(holding that district court erred by not appropriately considering the effect of an apparent conflict of interest upon decision to deny benefits where insurance company decided who was eligible for benefits and was payor of benefits). Importantly, however, several courts have held that this type of structural conflict of interest is obviated where, as here, benefits are paid from a trust rather than directly from corporate coffers. See e.g., Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 383-384 (3rd Cir. 2000); Turner v. Delta Family-Care Disability & Survivorship Plan, 291 F.3d 1270, 1273 (11th Cir. 2002); Buckley v. Metropolitan Life Ins. Co., 115 F.3d 936, 939 (11th Cir. 1997); De Nobel v. Virto Corp., 885 F.2d 1180, 1191 (4th Cir. 1989); Hall v. Int'l Union, 2007 U.S. Dist. LEXIS 56964 (D.W.Va. 2007); Peterson v. Fed. Express Corp. Long Term Disability Plan, 2007 U.S. Dist. LEXIS 41590, * 63 (D. Ariz. 2007). Like these courts, the Court concludes that no

10

structural conflict of interest affected Sedgwick's decision to deny the Plaintiff's claim for long-term disability benefits since disability benefits under the Plan are paid out of a trust funded by PNC's fixed contributions and there is no evidence that a denial of benefits in any way directly serves the financial interests of PNC or Sedgwick.

The Plaintiff also urges the Court to consider the effect of the conflict of interest that allegedly exists since Sedgwick relied upon the opinions of doctors it had employed to review the Plaintiff's medical file. And, indeed, the Sixth Circuit has observed, plan administrators have a "clear incentive to contract with individuals who [are] inclined to find in [their] favor." Calvert, 409 F.3d at 202; Darland v. Fortis Benefits Ins. Co., 317 F.3d 516, 527-528 (6th Cir. 2003). However, based on the administrative record before it, the Court cannot conclude that this potential conflict resulted in an unreasonable or unjust decision. There is no evidence to suggest that the physicians hired by Sedgwick regularly perform evaluations for Sedgwick or that their opinions were influenced by a desire to continue performing such evaluations.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for judgment on the record is **GRANTED** and the Plaintiff's motion for judgment on the record is **DENIED**. The Plaintiff is not entitled to attorneys' fees. **IT IS SO ORDERED**.

cc: Counsel of Record